1  G. JILL BASINGER - State Bar No. 195739
   jbasinger@glaserweil.com
2  RORY S. MILLER - State Bar No. 238780
   rmiller@glaserweil.com
3  GLASER WEIL FINK HOWARD
      AVCHEN & SHAPIRO LLP
4  10250 Constellation Boulevard, 19th Floor
   Los Angeles, California 90067
5  Telephone:  (310) 553-3000
   Facsimile:  (310) 556-2920
6
   Attorneys for Plaintiff
7  GRANT & EISENHOFER, P.A.

8           UNITED STATES DISTRICT COURT

9           CENTRAL DISTRICT OF CALIFORNIA

10

11 GRANT & EISENHOFER, P.A.,                    CASE NO.:_____

12              Plaintiff,                      COMPLAINT FOR:
                                                1. BREACH OF CONTRACT
13 v.                                           2. INTENTIONAL
                                                   INTERFERENCE WITH
14 BEVERLY BROWN; RICHARD                          CONTRACT
   HARPOOTLIAN, P.A.; BIENERT,                  3. QUANTUM MERUIT
15 MILLER, & KATZMAN, PLC; DOES 1               4. DECLARATORY RELIEF
   THROUGH 10,
16                                              DEMAND FOR JURY TRIAL
              Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

---

1
**COMPLAINT**

Glaser Weil

**Glaser Weil**

Plaintiff Grant & Eisenhofer P.A. (the "Plaintiff" or "G&E") advanced over $7 million in legal fees and costs on behalf of Defendant Beverly Brown ("Ms. Brown") and contracted with her to receive a 40% contingency fee in a massive False Claims Act matter.  Ms. Brown, in order to keep for herself and for her new attorneys, Bienert, Miller, and Katzman, PLC (the "Bienert Firm") and Richard Harpootlian, P.A. (the "Harpootlian Firm") (collectively, "Defendants")[1] all of the court-awarded fees and her portion of a $280 million settlement, conspired to terminate G&E.

This fraud, on information and belief, includes Defendants submitting obtaining attorneys' fees in the Celgene Matter (described below) based on, *inter alia*, time incurred by G&E even as they refuse to pay G&E, unjustly enriching themselves at G&E's expense.  The facts lead to the inescapable conclusion that the Defendants have conspired to induce Ms. Brown to breach her contract with G&E, and the object of the conspiracy is to perpetuate a fraud by claiming G&E's fees and costs as their own windfall recovery.

Faced with an enforceable retainer agreement with G&E, Ms. Brown and her new attorneys have attempted to claim that her retainer agreement is not valid in California.  As an initial matter, G&E is an east coast firm with no offices in California, as Ms. Brown was completely aware when she hired the firm.  But even were the retainer agreement not valid, Ms. Brown and her new attorneys would nevertheless be liable to G&E under *quantum meruit* principles.

## I.    <u>JURISDICTION AND VENUE</u>

1.    Jurisdiction for Plaintiff's claim lies with the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1332(a) because the parties reside in different states and because the amount in controversy exceeds $75,000.

---

[1] Together with a former G&E Director, Reuben Guttman, who, because of a contractual provision, must be sued separately in Washington, D.C.

2.     This Court has personal jurisdiction over Defendants because Defendants reside or do business in the State of California and this District.

3.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## II.     NATURE OF THE ACTION

4.     From 2009 to 2015, G&E represented Ms. Brown as the *qui tam* relator in the False Claims Act case *United States ex rel. Brown v. Celgene* (the "*Celgene* Matter"). That matter has settled for $280 million. Ms. Brown and her remaining lawyers are refusing to pay G&E any of its fees and costs, or any percentage of her recovery, so that they can keep Ms. Brown's share of this huge sum for themselves.

5.     Ms. Brown signed a retainer agreement with G&E on October 26, 2009 (the "*Celgene* Agreement"). Pursuant to the Celgene agreement, G&E was to represent Ms. Brown on a contingency fee basis and advance the costs of litigation. The value of the service provided by G&E were deemed to be G&E's awarded fees and costs, as well as 40% of any amount awarded to Ms. Brown as a relator. Notably, this agreement was drafted by a close associate of the Harpootlian Firm and the Bienert firm, Reuben Guttman, the same treacherous former G&E Director who stole the *Celgene* Matter from G&E.

6.     The *Celgene* Matter recently settled for $280 million, meaning that Ms. Brown is likely to receive between $70 and $84 million as a bounty, and the Bienert firm is will receive an unknown amount of court awarded attorneys' fees and costs, and, on information and belief, some percentage of this massive settlement. An FCA qui tam relator typically receives 25-30% of a settlement or judgment as a "bounty."

7.     Nevertheless, despite the fact that G&E represented Ms. Brown from 2009 through 2015, and incurred over $7 million in fees and costs representing Ms. Brown, she and her attorneys affirmatively refuse to pay G&E a dime in fees and costs, or any part of the relator's bounty she contracted to share with G&E.

1377606.1

8.    The Bienert firm is complicit and conspired with two east coast law firms in depriving G&E the money it is owed.  In 2015, a rogue G&E Director (the equivalent of a Partner), Reuben Guttman ("Guttman"), signed on Ms. Brown as a client at his newly formed firm, even while he was still a Director at G&E.  After signing on Ms. Brown as a client, Guttman delivered a three day old letter to G&E from Ms. Brown terminating their representation.

9.    The Bienert firm had been local counsel for Ms. Brown, and co-counsel, together with G&E while G&E still represented Ms. Brown, and remained local counsel through the settlement of the case and to the present.  Therefore, the Bienert firm knew of G&E retainer agreement and its terms, knew of Ms. Brown's surreptitious departure enabled by Guttman, and to this day continues in the concerted attempt to deprive G&E of its fees and costs and percentage of the *Celgene* Settlement.

10.    On information and belief, Harpootlian and the Harpootlian Firm began to represent and finance litigation in the *Celgene* Matter shortly after Ms. Brown terminated G&E.  Harpootlian and the Harpootlian firm continue to represent Ms. Brown and continue to interfere with Mr. Brown's obligation to share with G&E in the Celgene Settlement and to recover reasonable attorneys' fees and costs, and to be enriched at G&E's expense.

## III.    THE PARTIES

11.    Plaintiff G&E is a Delaware professional association with its principal place of business at 123 Justison Street, Wilmington, Delaware 19801.

12.    Beverly Brown is a resident of Los Angeles County, California.

13.    The Bienert Firm is a California corporation headquartered in San Clemente, California.

14.    The Harpootlian Firm is a professional association with its principal place of business in South Carolina.

**Glaser Weil**

## IV.    FACTUAL BACKGROUND

### A.    Ms. Brown's Retainer Agreement With G&E

15.    Ms. Brown began her relationship with G&E in 2009 through Guttman[2], then a Director at G&E.  The retainer agreement that Ms. Brown executed in October 2009 was drafted by Guttman.  As set forth above, under the terms of the *Celgene* Agreement, G&E was to represent Ms. Brown on a contingency fee basis and advance the costs of litigation.  The value of the service provided by G&E were deemed to be G&E's awarded fees and costs, as well as 40% of any amount awarded to Ms. Brown as a relator.

16.    Guttman knew that Ms. Brown worked for Celgene in California and that she was a resident of California.

17.    Guttman filed the *Celgene* Matter in federal court in the Central District of California.

18.    Guttman was a key player in incepting the *Celgene* Matter, managing the case while he was at G&E, and ultimately in surreptitiously forming a new firm, inducing Ms. Brown to fire G&E, and locking in Ms. Brown as a client before cutting off communication between G&E and Ms. Brown. Guttman accomplished all of this while still a Director at G&E and therefore in total derogation of his obligations to G&E.

### B.    Guttman Departs From G&E Along With Ms. Brown

19.    By early 2015, Guttman's relationship had soured and he had announced his intention to leave G&E by the end of the year. Guttman emailed Jim Sabella, a fellow director at G&E: "I have told Jay [Eisenhofer] that I will be leaving the firm by the end of the year. I do not want to blind side anyone. I cannot speak for Traci but I am 55 and need to move forward and do my now (sic) thing."

---

[2] Guttman would have been sued in the instant action, but due to a contractual provision Plaintiff is obligated to litigated claims against Guttman in Washington, D.C.

20.     Confirming that the decision to leave was his own, Guttman wrote to Jay Eisenhofer on the same day he wrote to Jim Sabella, explaining his decision to resign: "There have been a number of false starts on my resignation and part of it has been my absolute admiration and love for you…I would love to joint venture cases with GE but for now I need to do my own thing."

**C.      Guttman Delays His Resignation and Guttman and G&E Agree To A Transition Plan**

21.     In early 2015, after Guttman announced his decision to leave G&E, his relationship with G&E only grew worse, and ultimately it was decided that accelerating his departure would be best for all involved.

22.     As an example only, Guttman's behavior towards other Directors and staff had become so abrasive and abusive that it became necessary to part ways sooner than Guttman planned. For example, he berated a staff member by email, accusing him of "lacking substance" and comparing him to "colorless jellow (sic)without even the fruit chunkies."

23.     When the same staff member emailed Guttman that he was going to report Guttman's verbal abuse to HR, Guttman simply replied with a ":-)". When a marketing person suggested a cost cutting measure related to a service called Stampa, Reuben responded by threatening the marketing person's job by stating "Let's cut you and save Stampa".

24.     Guttman's abuse of staff and coworkers did not abate.  When emailing a colleague about a press inquiry, Guttman wrote: "It a fucking embarrassment that you dropped this case! You are a complete asshole!"

25.     Guttman himself acknowledged that continuing to work with G&E through the end of the year would be an impossibility.  On April 5, 2015, he wrote "I have honestly been thinking about it all weekend. I am very much pondering how I can do anything with the firm even on a short term basis."

26.     Nevertherless, Guttman, requested that the announcement of his decision

Glaser Weil

1  be delayed until certain key depositions in another matter could take place.

2      27.   G&E proposed, and Guttman agreed, that this interim time period should

3  be used for an orderly transition of matters he was handling, including the *Celgene*

4  Matter.

5      28.   The terms of this agreement included coordinated notice to clients of

6  G&E with respect to their options for continuing representation.  Guttman agreed that

7  neither party was to contact clients during this transition time until Guttman and G&E

8  could agree upon a unified approach.

9      29.   G&E followed through on its end of the bargain: G&E continued to hold

10  out Guttman as a Director, and continued to pay Guttman.

11      30.   Guttman, however, while still a Director at G&E, used the delay he had

12  orchestrated to secretly solicit G&E clients to join him at a new firm he was

13  developing, including and especially Ms. Brown.

14      **D.   Guttman Abuses G&E's Good Faith to Steal Ms. Brown and the**

15          ***Celgene* Matter**

16      31.   While G&E was following through on the promise of an orderly

17  transition and attempting to contact clients openly and appropriately, Guttman was

18  busy improperly and surreptitiously inducing Ms. Brown and other clients to

19  terminate their contracts with G&E.  Indeed, G&E was prepared to continue

20  representing Ms. Brown together with Guttman as co-counsel if the parties could

21  reach a fair agreement.  Unfortunately, as set forth below, Guttman and his co-

22  conspirators had no interest in keeping G&E as co-counsel, but wanted to use G&E as

23  a litigation funding source only.  This arrangement was not acceptable to G&E.  They

24  wanted to substantively participate in the case, but they would not act simply act as a

25  source of funds.

26      32.   As G&E had previously agreed, on April 23, 2015, a G&E attorney set

27  up a phone call with Ms. Brown to encourage her to remain with G&E.  Ms. Brown

28  failed to dial into the conference call, for reasons that soon became apparent.

Glaser Weil

33.   Contrary to the agreement that clients would be contacted jointly and in an orderly manner, on Friday, April 24, 2015 Guttman delivered what purported to be his resignation letter from the firm, and enclosed a letter from Ms. Brown dated April 21, 2015 terminating G&E as her counsel.  Guttman's letter warned G&E not to contact Ms. Brown except through counsel.

34.   Guttman procured Ms. Brown's termination letter by April 21 at the latest, therefore presenting Ms. Brown's departure as a fait accompli and leaving G&E unable to even contact Ms. Brown.

35.   It became clear that Guttman had caused Ms. Brown to terminate her relationship with G&E and had her secretly engage his new firm before resigning as a Director at G&E, denying G&E the opportunity to openly discuss Ms. Brown's options in the Celgene matter.

36.   Harpootlian and the Bienert Firm misrepresented to Ms. Brown and others the proposals for G&E to continue work on the Celgene matter: his take it or leave it proposal was that G&E continue to finance the case but not be involved in performing any work on it.  When G&E indicated that it was not interested in acting as a mere funding source and wanted to participate in the case substantively, Harpootlian abruptly hung up the phone.  The contention that G&E abandoned the *Celgene* matter is therefore demonstrably false.

**E.**   **Harpootlian and the Bienert Firm Interfere with G&E's Contract With Ms. Brown**

37.   The Bienert firm was local counsel and co-counsel with G&E during the time G&E represented Ms. Brown. On information and belief, the Bienert firm was aware of the terms of the *Celgene* Agreement between G&E and Ms. Brown.

38.   The Bienert firm continued to represent Ms. Brown at the time Guttman wrongfully induced Ms. Brown to take the *Celgene* Matter to his new firm.

39.   On information and belief, the Bienert firm was complicit in Guttman stealing the *Celgene* Matter for his new firm, while still a Director at G&E.

Glaser Weil

40.     The Bienert firm has continued to represent Ms. Brown through the present, and on information and belief has induced her to pay funds gained from the *Celgene* Settlement to themselves and not to pay anything to G&E.

41.     Similarly, Harpootlian and the Harpootlian Firm took over representation and litigation funding for the *Celgene* Matter shortly after Guttman stole the matter from G&E.

42.     On information and belief, Harpootlian and the Harpootlian Firm were aware of the *Celgene* Agreement between G&E and Ms. Brown at all relevant times, and continue to induce Ms. Brown not to pay any amount to G&E pursuant to the *Celgene* Agreement.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

43.     Plaintiff hereby incorporates and realleges the allegations contained in Paragraphs 1 through 42.

44.     Plaintiff and Ms. Brown entered into a valid contract, the terms of which require Ms. Brown to pay G&E for its reasonable attorneys' fees and costs, as well as 40% of the FCA relator's "bounty" recovered by Ms. Brown.

45.     Plaintiff performed fully under the *Celgene* Agreement, and paved the way for a $280 million settlement.

46.     Plaintiff incurred over $7 million in attorney's fees and costs representing Ms. Brown.

47.     Ms. Brown has refused to pay Plaintiff any money owed under the *Celgene* Agreement.

## SECOND CLAIM FOR RELIEF
### (Intentional Interference With Contract)

48.     Plaintiff hereby incorporates and realleges the allegations contained in Paragraphs 1 through 42.

49.   The Bienert firm was local counsel for Ms. Brown and co-counsel together with G&E during the time G&E represented Ms. Brown.

50.   On information and belief, the Bienert firm was aware of the *Celgene* Agreement between G&E and Ms. Brown, and of G&E and Ms. Brown's respective rights and duties under this contract.

51.   The Celgene Agreement was a valid contract.

52.   On information and belief, the Bienert firm acted together with Guttman, and the Harpootlian Firm to induce Ms. Brown to breach the *Celgene* Agreement in order to gain a greater share of the attorney's fees and costs awarded by the court in the *Celgene* Matter, and to keep for themselves a massive contingency fee for themselves.

53.   Indeed, each and every defendant conspired to interfere with the *Celgene* Agreement and each are liable on that basis.

### THIRD CLAIM FOR RELIEF
### (Quantum Meruit)

54.   Plaintiff hereby incorporates and realleges the allegations contained in Paragraphs 1 through 42.

55.   G&E performed extensive legal services pursuant to the *Celgene* Agreement with Ms. Brown, including taking the laboring oar in the case for 6 years, negotiating with the Government and CMS, briefed and defeated a motion to dismiss, and engaged in a massive discovery effort.

56.   Ms. Brown paid nothing for the legal services provided by G&E.

57.   Ms. Brown has benefited from G&E's services in an amount in the tens of millions of dollars.

58.   G&E is therefore entitled to its reasonable attorneys' fees and costs, as well as a pro rata share of the settlement amount recovered by Ms. Brown in the *Celgene* Matter.

Glaser Weil

1377606.1

# FOURTH CLAIM FOR RELIEF

## (Declaratory Relief)

59.     Plaintiff hereby incorporates and realleges the allegations contained in Paragraph 1 through 42.

60.     An actual controversy has arisen and now exists between Plaintiff and defendant concerning their respective rights and duties in that Plaintiff contends that it is owed its fees and costs and share of the *Celgene* Settlement, whereas Defendants disputes these contentions and contend that Plaintiff is owed nothing.

61.     Plaintiff desires a judicial determination of the respective rights and duties of the Parties under the *Celgene* Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against each Defendant, containing the following relief:

1.     On the First Claim, damages in an amount to be determined at trial;

2.     On the Second Claim, damages, including punitive damages, in an amount to be determined at trial;

3.     On the Third Claim, damages in an amount to be determined at trial;

4.     On the Fourth Claim, a judicial determination as set forth above;

5.     An award of costs and fees that Plaintiff has incurred in this action.

6.     Such other and further relief as the Court may deem just and proper.

1377606.1

DATED:  August 10, 2017

GLASER WEIL FINK HOWARD
AVCHEN & SHAPIRO LLP

By:  _____/s/_____
        G. JILL BASINGER
        RORY S. MILLER
        Attorneys for Grant & Eisenhofer, P.A.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues to the full extent permitted by law.

DATED:  August 10, 2017

GLASER WEIL FINK HOWARD
AVCHEN & SHAPIRO LLP

By:  _____/s/_____
        G. JILL BASINGER
        RORY S. MILLER
        Attorneys for Grant & Eisenhofer, P.A.